**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :

TONY SPIRES,                               :
                                          :

             Plaintiff,                 :
                                          :

        -against-                :          Case No. 18-cv-04464
                                          :

METLIFE GROUP, INC.; TOM LUCKEY,     :          **Oral Argument Requested**
Individually, DOUGLAS RAYVID, Individually,  :
And RICARDO ANZALDUA, Individually,     :
                                          :
                                          :

             Defendants.            :
                                          :
-------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Ashley Hale
Christopher A. Parlo
Melissa C. Rodriguez

101 Park Avenue
New York, New York 10178
Tel.: (212) 309-6000
Fax: (212) 309-6001

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

SUMMARY OF UNDISPUTED FACTS ................................................ 2

    A.   MetLife's Compliance Department And Corporate Privacy Office. ......... 2

    B.   MetLife Is Designated As a "SIFI" And Must Get "Fed Ready" By Overhauling the Privacy Office. ............................................................ 3

    C.   Jonathan Corbett Was By Far The Most Qualified To Lead The Overhaul Of The Privacy Office. ....................................................... 4

    D.   Plaintiff, Who Had Never Run A Compliance Department Or Even Managed Employees, Was Not The Most Qualified To Overhaul The Privacy Office. ...................................................................... 6

    E.   Plaintiff Quits When He Is Not Chosen As Chief Privacy Officer ........... 7

    F.   Christin Williams Had Far More Seniority And More Experience Than Plaintiff, And Did Not Perform The Same Job As Plaintiff. ........... 7

    G.   Most of Plaintiff's Claims Have Already Been Dismissed. ..................... 8

ARGUMENT ....................................................................................... 9

    I.    SUMMARY JUDGMENT STANDARD. ......................................... 9

    II.   PLAINTIFF'S RACE DISCRIMINATION CLAIMS AGAINST METLIFE FOR FAILURE TO PROMOTE SHOULD BE DISMISSED. ......... 10

    A.   Plaintiff Bears The Ultimate Burden Of Proof. ...................................... 10

    B.   Plaintiff Cannot Establish A Prima Facie Case For Failure to Promote. ................................................................................ 11

        1.   There Are No Circumstances that Give Rise to an Inference of Discrimination. ..................................................... 11

        2.   Mr. Corbett Was More Qualified Than Plaintiff. ....................... 13

        3.   MetLife Had Legitimate, Non-Discriminatory Reasons For Selecting Mr. Corbett for Chief Privacy Officer – He Was More Qualified. ....................................................... 15

        4.   Plaintiff Has No Evidence That MetLife's Actions Were False Or Pretextual. ............................................... 17

    C.   Plaintiff's Failure To Promote Claim Also Fails As A Matter Of Law Under The NYCHRL. ............................................................. 19

    III.   PLAINTIFF'S RACE DISCRIMINATION CLAIMS AGAINST MR. RAYVID FOR FAILURE TO PROMOTE SHOULD BE DISMISSED. .......... 19

# TABLE OF CONTENTS
(continued)

**Page**

IV.    PLAINTIFF'S TITLE VII DISPARATE PAY CLAIM AGAINST METLIFE SHOULD BE DISMISSED. ............................................................ 21

        1.    Plaintiff and Ms. Williams Did Not Perform the Same Job ........ 22

        2.    There Is No Evidence of Discriminatory Intent in Paying Ms. Williams Slightly More than Plaintiff ................................. 23

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................9

*Anyanwu v. City of New York*,
2013 WL 5193990 (S.D.N.Y. Sept. 16, 2013)..........................................13

*Bell v. Metropolitan Transp. Authority*,
2013 WL 8112461 (S.D.N.Y. Nov. 1, 2013).............................................17

*Bennett v. Health Mgmt. Sys. Inc.*,
936 N.Y.S.2d 112 (1st Dep't 2011) ..........................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................9

*Conigliaro v. Horace Mann School*,
2000 WL 45439 (S.D.N.Y. Jan. 19, 2000) ...............................................24

*Coraggio v. Time Inc. Magazine Co.*,
1996 WL 139786 (S.D.N.Y. Mar. 28, 1996) ...........................................24

*Davis-Bell v. Columbia Univ.*,
851 F. Supp. 2d 650 (S.D.N.Y. 2012)......................................................20

*DeJesus v. Starr Technical Risks Agency, Inc.*,
2004 WL 2181403 (S.D.N.Y. Sept. 27, 2004).........................................23

*Delaney v. Bank of Am. Corp.*,
766 F.3d 163 (2d Cir. 2014).......................................................................13

*Duckett v. Foxx*,
2015 WL 4911160 (E.D.N.Y. Aug. 17, 2015).....................................13, 14, 15, 18

*Fletcher v. ABM Building Value*,
2018 WL 1801310 (S.D.N.Y. Mar. 28, 2018) .....................................10, 11

*Gonzalez v. City of New York*,
354 F. Supp. 2d 327 (S.D.N.Y. 2005).......................................................14

*Hill v. Bloomberg L.P.*,
2016 WL 1665599 (S.D.N.Y. Apr. 20, 2016)......................................10, 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hines v. Hillside Children's Ctr.*,
    73 F. Supp. 2d 308 (W.D.N.Y. 1999) ........................................................................18

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ..................................................................................................10

*McPherson v. NYP Holdings, Inc.*,
    2005 WL 2129172 (E.D.N.Y. Sept. 1, 2005) ...........................................................23

*Moy v. Perez*,
    2016 WL 5239611 (S.D.N.Y. Sept. 21, 2016) ...........................................15, 17, 18

*Mullins v. Consolidated Edison Co. of New York, Inc.*,
    2015 WL 4503648 (S.D.N.Y. July 22, 2015) ..........................................................19

*Oluyomi v. Napolitano*,
    811 F. Supp. 2d 926 (S.D.N.Y. 2011) ......................................................................18

*Pierre v. City of New York*,
    2020 WL 353538 (S.D.N.Y. Jan. 21, 2020) .............................................................20

*Pointdujour v. Mount Sinai Hosp.*,
    2004 WL 110617 (S.D.N.Y. Jan. 20, 2004), *aff'd*, 121 F. App'x 895 (2d Cir.
    2005) ...........................................................................................................................9

*Potash v. Fla. Union Free Sch. Dist.*,
    972 F. Supp. 2d 557 (S.D.N.Y. 2013) ......................................................................22

*Quarless v. Bronx-Lebanon Hosp. Ctr.*,
    228 F. Supp. 2d 377 (S.D.N.Y. 2002) ......................................................................21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ..................................................................................................10

*Robinson v. Zurich N. Am. Ins. Co.*,
    892 F. Supp. 2d 409 (E.D.N.Y. 2012) ..................................................................9, 18

*Rozenfeld v. Dep't of Design & Constr. of the City of N.Y.*,
    875 F. Supp. 2d 189 (E.D.N.Y. 2012) ......................................................................12

*Satterfield v. United Parcel Serv., Inc.*,
    2003 WL 22251314 (S.D.N.Y. Sept. 30, 2003) ...........................................11, 12, 24

*Scaria v. Rubin*,
    117 F.3d 652 (2d Cir. 1997), *aff'd*, 481 F. App'x 693 (2d Cir. 2012) .....................18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sealy v. Hertz Corp.*,
    688 F. Supp. 2d 247 (S.D.N.Y. 2009)........................................................................19

*Simpson v. Metro-North Commuter R.R.*,
    2006 WL 2056366 (S.D.N.Y. July 20, 2006) ............................................................23

*Sosa v. N.Y. Div. of Human Rights*,
    2015 WL 5191205 (E.D.N.Y. Sept. 4, 2015) ............................................................14

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)....................................................................................................10

*Stinnett v. Delta Air Lines, Inc.*,
    2019 WL 1493224 (E.D.N.Y. Mar. 31, 2019) ..........................................................20

*Strauss v. N.Y. Dep't of Educ.*,
    26 A.D.3d 67 (3d Dep't 2005) ..................................................................................21

*Suarez v. Am. Stevedoring, Inc.*,
    2009 WL 3762686 (E.D.N.Y. Nov. 10, 2009) ..........................................................21

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)....................................................................................................10

*Wharff v. State Univ. of N.Y.*,
    413 F. App'x 406 (2d Cir. 2011) ..............................................................................18

*White v. Pacifica Foundation*,
    973 F. Supp. 2d 363 (S.D.N.Y. 2013)........................................................................21

*Wright v. City of Syracuse*,
    2014 WL 1293527 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 611 F. App'x 8 (2d Cir.
    2015) ..........................................................................................................................14

*Yu v. New York City Hous. Dev. Corp.*,
    494 F. App'x 122 (2d Cir. 2012) ..............................................................................17

**Statutes**

Foreign Account Tax Compliance Act ("FATCA")......................................................5

New York City Human Rights Law ("NYCHRL")................................................ *passim*

New York City Human Rights Law ("NYSHRL") ................................................ *passim*

Title VII of the Civil Rights Act of 1964 ("Title VII") ........................................ *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

Federal Reserve Division of Banking Supervision and Regulation's Supervisory
Letter SR 08-8 ................................................................................................. *passim*

## PRELIMINARY STATEMENT

Defendants MetLife Group, Inc. ("MetLife" or the "Company") and Douglas Rayvid (collectively, "Defendants")[1] respectfully submit this Memorandum of Law in support of their summary judgment motion to dismiss Plaintiff Tony Spires' ("Plaintiff") claims that Defendants discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), and that MetLife paid Plaintiff less than a White, female colleague in violation of Title VII.  Because no genuine issue of material fact exists, summary judgment should be granted to Defendants.

Plaintiff's race discrimination claim for failure to promote has no merit for the simple reason that Plaintiff was not the most qualified candidate for the position he sought.  Plaintiff, who had worked for MetLife, and in MetLife's Corporate Privacy Office, for less than two years, believed he deserved to replace his manager as the Chief Privacy Officer upon his manager's retirement.  MetLife, however, had decided to implement a complete overhaul of the Corporate Privacy Office to function in a global compliance oversight role in line with applicable federal regulations.  Because MetLife determined the Privacy Office had not been performing up to necessary standards as a proactive, oversight unit, it decided that it needed someone new at the helm who had the experience to lead such a transformation.  Jonathan Corbett, a Director-level employee with a law degree, who had been at MetLife for at least 2 years longer than Plaintiff, had *already* demonstrated success in recently leading a similar overhaul of the Anti-Corruption and Anti-Money Laundering Units into a global compliance oversight function.  Plaintiff admits he did not have any similar qualifications or experience.  Because Mr. Corbett had these exceptional qualifications and uniquely relevant experience, MetLife selected him as the new

---

[1] Plaintiff has voluntarily dismissed all claims against Ricardo Anzaldua and Tom Luckey without prejudice.  *See* Dkt Nos. 63 and 68.

Chief Privacy Officer.  Mr. Corbett then exceeded all expectations in the position.  Plaintiff cannot point to any evidence – because there is none – that the selection of Mr. Corbett for the role of Chief Privacy Officer was in any way related to race.

Plaintiff's disparate pay claim based on race and gender also must be dismissed because he cannot identify any similarly-situated employee outside of his protected class who was paid more than him.  Not only did the only comparator employee Plaintiff identifies, Christin Williams, have more seniority and experience at MetLife than Plaintiff, Plaintiff admits that he and Ms. Williams had substantially different roles and duties within the Privacy Office. Moreover, Plaintiff admits there is no evidence of any discriminatory intent behind the small $5,000 difference in their salaries – which is easily attributed to Ms. Williams having been at MetLife *for seven more years than Plaintiff.*  Accordingly, Plaintiff's pay disparity claim also fails.

The Court therefore should grant summary judgment in Defendants' favor and dismiss Plaintiff's remaining claims in their entirety.

## SUMMARY OF UNDISPUTED FACTS[2]

### A.      MetLife's Compliance Department And Corporate Privacy Office.

MetLife's Corporate and Ethics Compliance Department ("CEC") is responsible for ensuring that MetLife's business is conducted in accordance with applicable regulations and mitigates compliance risks.  SOF ¶ 2.  The Corporate Privacy Office ("Privacy Office" or "CPO") is one unit within the CEC, and is responsible for implementing and supporting MetLife's global compliance programs in the areas of privacy and information security.  SOF ¶ 7.  Plaintiff was a Lead Data Privacy Consultant in the CPO from October 2014 until his

---

[2] The full set of undisputed facts in support of this motion are set forth in Defendants' Local Rule 56.1 Statement of Undisputed Material Facts.  For the Court's convenience, a summary of the facts is set forth below.

resignation in March 2016.  SOF ¶ 9.  During all but a few weeks of Plaintiff's employment, the

CPO was led by Chief Privacy Officer Joseph Trovato, who was Plaintiff's direct manager.  SOF

¶ 10.

>    **B.**    **MetLife Is Designated As a "SIFI" And Must Get "Fed Ready" By
>         Overhauling the Privacy Office.**

In or about the end of 2014, the Federal Stability Oversight Council ("FSOC") designated

MetLife as a Significantly Important Financial Institution ("SIFI").  SOF ¶ 11.  Being designated

as a SIFI meant that MetLife, including its compliance departments within the CEC, was subject

to the oversight of the Federal Reserve and had to comply with certain federal regulations.  SOF

¶ 12.  It also meant that the Federal Reserve could come to MetLife and perform a full audit of

its compliance programs – including the Privacy Office – at any point, to test whether the

compliance program was adhering to, and aligning with, the expectations of the Federal Reserve.

SOF ¶ 13.   Some of those expectations were promulgated in the Federal Reserve Division of

Banking Supervision and Regulation's Supervisory Letter SR 08-8 ("SR 08-8"), which explains

that SIFI compliance departments should have a framework for identifying, assessing,

controlling, measuring, monitoring, and reporting on compliance risks throughout the

organization, as well as a framework for providing training regarding these compliance risks.

SOF ¶¶ 14-15.

As Mr. Rayvid analyzed all of the CEC's compliance programs, he realized that, unlike

other programs within the CEC, the CPO was not being proactive and adequately monitoring,

testing, and conducting risk assessment activity.  SOF ¶ 19.  Mr. Rayvid and Tom Luckey, the

head of the Compliance Risk Management and Investigations Department ("CRM &

Investigations") (another unit within the CEC), worked with Mr. Trovato in an attempt to get the

CPO "up to snuff."  SOF ¶¶ 19-20.  However, Mr. Trovato and his team (including Plaintiff)

failed to do so.  Accordingly, Mr. Rayvid asked Mr. Trovato to accelerate his planned retirement

so he could bring in someone who would overhaul the CPO and run it like a global oversight unit.  SOF ¶¶ 25-27.

      **C.**      **Jonathan Corbett Was By Far The Most Qualified To Lead The Overhaul Of The Privacy Office.**

Mr. Rayvid wanted to replace Mr. Trovato with someone who already had experience leading the transition of a compliance department within MetLife to a global oversight unit.  SOF ¶ 30.  Contrary to Plaintiff's view of what was needed, Mr. Rayvid did not need an expert in privacy, but rather he needed a compliance risk assessment expert who "could turn a unit around."  SOF ¶ 31.  Mr. Corbett had *exactly* that experience.  Not long after Mr. Corbett joined MetLife's International FCPA/AML/Anti-Corruption Unit ("Anti-Corruption Unit") in 2012, he began to overhaul the unit with his manager, Laura Heeger.  SOF ¶ 39.  In 2014, Mr. Corbett was promoted to head of the Anti-Corruption Unit when Ms. Heeger was herself promoted, and he continued to implement changes and drive the evolution of the Anti-Corruption Unit, which included building the Anti-Corruption Unit into a global oversight unit.  SOF ¶ 40.

In overhauling the Anti-Corruption Unit, Mr. Corbett: designed enterprise-wide minimum standards across nearly forty-five markets relating to Compliance risks; implemented baseline metrics across markets to assess and oversee the effectiveness of Compliance risk controls; established methodologies to independently assess risks in each market and across the enterprise globally; and developed substantive toolkits and resources for local Compliance teams to enable them to successfully oversee risk and work with their business partners in managing risk.  SOF ¶ 42.  Mr. Corbett also set up guidelines for monitoring and testing activity, put together models on how to perform risk assessments, developed scorecards, and organized roles and responsibilities for the local compliance organization, regional compliance organization, and

the central risk units.  SOF ¶ 43.[3]  In short, as Plaintiff admitted, Mr. Corbett had "substantial compliance oversight experience," including the ability to design an oversight function.  SOF ¶ 86.  And Mr. Corbett's transformation of the Anti-Corruption Unit became the model for MetLife's central risk programs.  SOF ¶ 45.

Given this experience, along with the fact that Mr. Corbett was rated by leadership as top talent, Mr. Rayvid knew Mr. Corbett was uniquely qualified to lead the CPO's transformation into a global compliance unit.  SOF ¶ 47.[4]  Accordingly, in March 2016, Mr. Corbett was appointed Chief Privacy Officer.  SOF ¶ 54.

Mr. Rayvid's selection of Mr. Corbett proved to be the perfect choice.  In a very short period Mr. Corbett developed a new global privacy compliance policy, which established enterprise-wide minimum standards; he developed a mechanism and methodology for assessing risk across MetLife, including a methodology for assessing risk in each market; he established enterprise-wide metrics to enable MetLife to oversee the effectiveness of controls; he created "robust testing," to establish consistency in how local compliance officers monitored and tested controls; he developed an onsite substantive testing program; and he set up new risk reporting in order to make MetLife compliance more data driven. SOF ¶¶ 74-75.  Accolades concerning Mr. Corbett's transformation of the Privacy Office include:

- "Jon hit the ground running and transformed Privacy from a U.S. testing and advisory unit, to a global oversight function."

---

[3]Mr. Corbett also built a compliance program to guide MetLife in complying with the Foreign Account Tax Compliance Act ("FATCA").  SOF ¶ 46.  Mr. Corbett, along with Ms. Heeger, built a program from scratch to make sure the right controls were in place so MetLife could comply with FATCA. *Id.*

[4] In addition to being rated as top talent, Mr. Corbett was one of a rare few individuals who received the highest performance rating for three straight years in 2014, 2015 and 2016.  Only 10% of MetLife's employees receive that rating each year and fewer still receive it in successive years.  SOF ¶¶ 55-56.  Plaintiff never received that rating.  SOF ¶ 56.  And Plaintiff has no evidence that Mr. Corbett's reviews were not accurate.  SOF ¶ 57.

"[Mr. Corbett] did the work of years in a matter of months."

"[Mr. Corbett] exponentially improved relationships, and partnered with Procurement to reshape 3rd party processes."

SOF ¶ 76.

### D.   Plaintiff, Who Had Never Run A Compliance Department Or Even Managed Employees, Was Not The Most Qualified To Overhaul The Privacy Office.

Plaintiff had none of the experience Mr. Corbett had transforming a compliance unit from an advisory unit to one that: actively deals with local compliance teams; teaches those compliance teams how to perform risk assessments; and monitors, tests, and tracks the progress of compliance teams in various countries.  SOF ¶ 72.   At the time Mr. Trovato was being replaced, all Plaintiff had under his belt was a one-year tenure at MetLife performing "advisory service work" in the Privacy Office.  SOF ¶ 65.   That advisory work principally involved responding to privacy related questions, and addressing personal data incidents, on a reactive basis.  SOF ¶ 65.

Critically, SR 08-8 explains that SIFI compliance departments should perform like auditing departments.  SOF ¶ 16.  Plaintiff had not performed *any* auditing work during his time at MetLife.  SOF ¶ 67.   That is not surprising, as Plaintiff admitted that he did not even know what SR 08-8 was.  SOF ¶ 78 (Q: "Do you know what SR 08-8 is?  A: No, I'm not familiar with it.  It doesn't come to mind. What is that --").  Given his limited compliance work, as Plaintiff had to admit, if the goal was to make the Privacy Office more compliance oriented "he [Corbett] was more qualified than I was, since I had not overhauled any functions or increased Compliance levels within a function."  SOF ¶ 87 ("I have not been responsible for a Compliance Program").

In addition to not having any experience overhauling a compliance unit, Plaintiff was less qualified than Mr. Corbett for the Chief Privacy Officer position for numerous other reasons. Unlike Mr. Corbett, who always received the highest rating on his annual reviews (*see* p. 5, n. 4,

*supra*), Plaintiff only received a rating of "Good" on his one review.[5]  SOF ¶ 56.  Unlike Mr. Corbett, who was judged to be "Emerging Talent" by senior management, Plaintiff was judged to be only an "Experienced Performer."  SOF ¶ 72.  Unlike Mr. Corbett, who had a law degree, passed the New York Bar, and practiced as a lawyer, Plaintiff could not even pass the exam to become a Project Management Professional ("PMP").  SOF ¶ 109.  Unlike Mr. Corbett, in no job prior to MetLife had Plaintiff created a new department, and in the decade before coming to MetLife he had not overseen any other employees.  SOF ¶ 62.  Plaintiff managed no employees at MetLife.  SOF ¶ 63.  Moreover, Mr. Rayvid was trying to move the CPO *away* from the way it was performing under Trovato (as an advisory, legal interpretation function) and towards a monitoring and testing compliance oversight function.  SOF ¶ 64.  Given that Mr. Rayvid had been unhappy with the overall performance of the CPO's compliance with SR 08-8, and that Plaintiff had been a part of that CPO unit (and considered himself Mr. Trovato's "right hand man"), it simply did not make sense to give Plaintiff the Chief Privacy Officer position when Mr. Trovato left.  SOF ¶ 64.

### E.      **Plaintiff Quits When He Is Not Chosen As Chief Privacy Officer.**

When Mr. Corbett received the promotion, Mr. Luckey spoke with Plaintiff and assured him that he "was a valuable member of the Privacy Office" and that "there were or could be future opportunities within Compliance" for Plaintiff.  SOF ¶ 84.  Rather than be a part of the transformation of the CPO, Plaintiff tendered his voluntary resignation, effective March 25, 2016.  SOF ¶ 81.

### F.      **Christin Williams Had Far More Seniority And More Experience Than Plaintiff, And Did Not Perform The Same Job As Plaintiff.**

Despite both being Directors in the Privacy Office, Plaintiff and Christin Williams

---

[5] Plaintiff admits that his statement in the Complaint that his job performance was "outstanding" (Amended Compl. at ¶ 153) was a "mistake."  His performance was only "good." SOF ¶ 56.

(White, female), did not perform the same job – a fact repeatedly admitted by Plaintiff and well known by Mr. Rayvid, Mr. Luckey, and Mr. Trovato.  SOF ¶¶ 120-121.  Plaintiff "was more on the technical side," and Ms. Williams was "more on the Compliance side" in the Privacy Office. SOF ¶ 112.  As Plaintiff admitted, Ms. Williams spent 85-90% of her time on Governance, Risk and Compliance work, on which Plaintiff was spending only 15% of his time.  SOF ¶ 113.  Ms. Williams "was heavily involved in the creation of the Compliance Program for Privacy," including by "work[ing] very closely . . . on the creation of Compliance related frameworks and testing," and, as such, Ms. Williams had more experience than Plaintiff in creating Compliance-related controls.  SOF ¶ 114.  Ms. Williams was the project lead on a Binding Corporate Rules project, a Cross Border Data Transfer project, and a Privacy framework update project.  SOF ¶ 116.  Plaintiff did *not* work on those projects, and did *not* lead any project Ms. Williams was on. SOF ¶ 117.  Instead, Plaintiff worked on projects "about MetLife's use of customer and employee data and mitigating the risk of noncompliance to legislation."  SOF ¶ 115.  Ms. Williams' "role had nothing to do with that type of work," or with any of "the project work that [Plaintiff] was doing."  SOF ¶ 115.

In addition to performing different roles and having different impacts on MetLife's business, Ms. Williams had far more seniority and experience than Plaintiff.  SOF ¶ 106.  Ms. Williams worked at MetLife for seven years longer than Plaintiff, was a Director for two and one half years longer than Plaintiff, and had her Masters' Degree and PMP designation.  SOF ¶¶ 106-109.  Plaintiff could not pass the test to get his PMP designation.  SOF ¶ 109.  Despite having a greater level of experience, different job duties, and 7 years' more seniority, Ms. Williams' annual salary was only $5,000 more than Plaintiff's salary.  SOF ¶ 123.

G.   **Most of Plaintiff's Claims Have Already Been Dismissed.**

On May 29, 2018, Plaintiff filed a Complaint against MetLife and Individual Defendants Douglas Rayvid, Tom Luckey, and Ricardo Anzaldua, asserting various age, gender, and race

discrimination, retaliation, and equal pay claims.  *See* Dkt. No. 3.  On September 24, 2018 he

amended his complaint.  *See* Dkt No. 33.  Defendants moved to dismiss the amended complaint.

*See* Dkt Nos. 25, 38, 41.  On September 18, 2019, the Court dismissed all of Plaintiff's claims

except for: (1) the race discrimination claim for failure to promote against MetLife and the

individually named defendants; and (2) the Title VII pay discrimination claim against MetLife.

*See* Dkt No. 45.  Subsequently, Plaintiff voluntarily dismissed all claims against Mr. Anzaldua

and Mr. Luckey.  *See* Dkt Nos. 63 and 68.  Accordingly, the only remaining claims are Plaintiff's

failure to promote claims against MetLife and Mr. Rayvid, and Plaintiff's Title VII pay

discrimination claim against MetLife.

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD.

"One of the principal purposes of the summary judgment rule is to isolate and dispose of

factually unsupported claims or defenses, and we think it should be interpreted in a way that

allows it to accomplish this purpose."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

Only an issue of *material* fact is sufficient to defeat summary judgment.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Summary judgment is mandated if the non-moving

party fails to establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.

"[C]onclusory allegations, speculation, conjecture or denials, without more, will not

defeat a motion for summary judgment." *Pointdujour v. Mount Sinai Hosp.*, 2004 WL 110617, at

*3 (S.D.N.Y. Jan. 20, 2004), *aff'd*, 121 F. App'x 895 (2d Cir. 2005); *Robinson v. Zurich N. Am.

Ins. Co.*, 892 F. Supp. 2d 409, 425 (E.D.N.Y. 2012) ("the nonmoving party may not rest upon

mere conclusory allegations or denials but must set forth 'concrete particulars' showing that a

trial is needed.").

This is precisely the type of case that should be dismissed by summary judgment.

Plaintiff cannot offer competent, admissible evidence sufficient to establish that Defendants did not select him for the Chief Privacy Officer role because of his race, or that MetLife paid him less than Ms. Williams because she is a woman.

## II.     PLAINTIFF'S RACE DISCRIMINATION CLAIMS AGAINST METLIFE FOR FAILURE TO PROMOTE SHOULD BE DISMISSED.

### A.     Plaintiff Bears The Ultimate Burden Of Proof.

Plaintiff bears the burden to establish discrimination by a preponderance of the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Employment discrimination claims under Title VII, §1981, and the NYSHRL are analyzed using the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and clarified in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Fletcher v. ABM Building Value*, 2018 WL 1801310, at *8, 24 (S.D.N.Y. Mar. 28, 2018). Under this framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination on the basis of his race. *Fletcher*, 2018 WL 1801310, at *8. If Plaintiff can establish a *prima facie* case, the burden of production shifts to MetLife to proffer a legitimate, non-discriminatory reason for its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see Fletcher*, 2018 WL 1801310, at *8. If Defendants do so, Plaintiff can only prevail on his claims by proving that Defendants' legitimate, non-discriminatory reason was not its true reason, but rather a pretext for discrimination. *Burdine*, 450 U.S. at 254; *see Fletcher*, 2018 WL 1801310, at *8.

Even under the NYCHRL, Plaintiff must still first establish that his "employer treated [him] less well, at least in part for a discriminatory reason." *Hill v. Bloomberg L.P.*, 2016 WL 1665599, at *9 (S.D.N.Y. Apr. 20, 2016). If a plaintiff can make that showing, the burden then similarly shifts to the defendant to demonstrate a legitimate and non-discriminatory reason for the adverse employment action and that discrimination did not play a role in its decision. *Id.*

"Notwithstanding this different analysis, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment… [and], the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff." *Id.* at *10 (internal quotations and citations omitted).

On the record here, Plaintiff cannot meet his burdens under federal, state or city law.

### B.  **Plaintiff Cannot Establish A *Prima Facie* Case For Failure to Promote.**

To establish a *prima facie* case of discrimination for failure to promote under Title VII, § 1981, and the NYSHRL, Plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for a promotion to a position for which he was qualified, or he was not informed of the opportunity to apply to an unposted position; (3) he was rejected for the position; and (4) the rejection was under circumstances that give rise to an inference of discrimination.  *Fletcher*, 2018 WL 1801310, at *8 (citations omitted).

Plaintiff cannot establish a *prima facie* case of discrimination as there is absolutely no evidence to suggest that Defendants harbored any discriminatory animus toward Plaintiff because of his race, or that race played any part in the decision to select the more qualified candidate for the Chief Privacy Officer position.  Indeed, the evidence clearly demonstrates that Mr. Corbett was chosen for the Chief Privacy Officer position solely because of his superior qualifications.

#### 1.  **There Are No Circumstances that Give Rise to an Inference of Discrimination**.

There is not a shred of evidence – let alone a dispute of fact – to suggest that Plaintiff was denied the Chief Privacy Officer position because he is Black.  Indeed, *Plaintiff readily admits that he has no evidence to support his claim* other than the fact that Mr. Corbett is White and he is Black.  SOF ¶ 96.  Such conclusory allegations are not nearly sufficient to support the serious charge of discrimination.  *See, e.g.*, *Satterfield v. United Parcel Serv., Inc.*, 2003 WL 22251314,

at *14 (S.D.N.Y. Sept. 30, 2003) ("adversity in the workplace coupled with membership in a protected class does not, standing alone, give rise to an inference of discrimination").

Plaintiff admits that no one at MetLife ever made derogatory comments or jokes about or toward him because of his race, and that he did not see any cartoons or postings of any kind related to race. SOF ¶ 91; *see, e.g.*, *Rozenfeld v. Dep't of Design & Constr. of the City of N.Y.*, 875 F. Supp. 2d 189, 205 (E.D.N.Y. 2012) (no inference of race discrimination where, *inter alia*, "Plaintiff explicitly states nobody made disparaging comments about his race"). Quite the opposite – Plaintiff testified that he enjoyed his employment with MetLife and the only thing that he believes was "discriminatory" about his employment was the fact that he was not promoted to Chief Privacy Officer. SOF ¶ 97. He could not identify any other decisions by Messrs. Luckey or Rayvid that he thought were discriminatory. SOF ¶ 99. He could not identify any discriminatory event involving Luckey or Rayvid. SOF ¶ 100. He was never demoted, disciplined or harassed because of his race. SOF ¶ 101. Nothing in his one performance appraisal (he was only there one full year) was discriminatory. SOF ¶ 102. He could produce no evidence that any other person of color was denied a promotion in the CEC because of race. SOF ¶ 103. Indeed, he could not identify anything in the year and a half he worked at MetLife before the promotion decision that he found discriminatory. SOF ¶ 104.

Plaintiff's own testimony also undermines his purported "belief" that the decision to appoint Mr. Corbett was somehow race related. Plaintiff admitted that he would have found fault with the appointment of *anyone* to the position of Chief Privacy Officer, other than himself. SOF ¶ 90. Plaintiff surprisingly explained that even if a Black employee with Mr. Corbett's exact qualifications had been promoted, Plaintiff *still* would have complained about the decision. SOF ¶ 90. Plaintiff acknowledged that in the circumstance of a Black man being promoted, he wouldn't be able to blame race discrimination, but he would need to come up with a different excuse. SOF ¶ 90; *see Satterfield*, 2003 WL 22251314, at *14. Accordingly, as his own

12

testimony makes clear, Plaintiff's complaint is not about race, but that he disagrees with the selection of anyone but himself for the Chief Privacy Officer position.  However, the law is clear that merely disagreeing with Defendants' business decision that Mr. Corbett was the most qualified is not sufficient to raise even an inference of discrimination.  As such, Plaintiff has failed to plead a *prima facie* case of discrimination.  *See Duckett v. Foxx*, 2015 WL 4911160, at *8 (E.D.N.Y. Aug. 17, 2015) ("While [courts] must ensure that employers do not act in a discriminatory fashion, we do not sit as a super-personnel department that reexamines an entity's business decisions." (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014)).

### 2.  Mr. Corbett Was More Qualified Than Plaintiff.

"In the failure-to-promote context, a comparison of the plaintiff's qualifications to those of the promoted employee is appropriate at the *prima facie* stage."  *Duckett*, 2015 WL 4911160, at *6 (citation omitted).  To state a *prima facie* case for failure to promote, a plaintiff "must provide at least some evidence that his qualifications were comparable to those of the selected employees."  *Anyanwu v. City of New York*, 2013 WL 5193990, at *16 (S.D.N.Y. Sept. 16, 2013).  Plaintiff has provided no evidence – because he cannot – that his qualifications were comparable to Mr. Corbett's qualifications to lead the "overhaul" of the Corporate Privacy Office.

Mr. Corbett: has a law degree, practiced as a lawyer, consistently received the highest rating on his annual performance reviews, was judged to be top talent, worked at MetLife for two years longer than Plaintiff, and had more managerial experience than Plaintiff.  SOF ¶¶ 36, 55, 56, 41.  Those attributes by themselves are enough to prove Mr. Corbett was more qualified than Plaintiff to lead the CPO, as Plaintiff: does *not* have a law degree, *never* practiced as a lawyer, did *not* receive the highest rating on his performance review, was *not* judged to be top talent, worked at MetLife for two years *less* than Mr. Corbett, and had *no* managerial experience.  SOF ¶¶ 56, 60-63.  However, even more critically, Mr. Corbett met the principle criteria used for

13

selecting a new leader for the Privacy Office – someone with experience transforming compliance units to meet regulatory obligations.  Mr. Corbett had direct, relevant experience, and a track record of great success, in leading another MetLife compliance unit through the same type of transition that MetLife wanted for the Privacy Office.  SOF ¶¶ 34.  Indeed, Mr. Corbett was so successful in turning the Anti-Corruption unit into a global compliance unit, that his evolution of the Anti-Corruption Unit became the model for all of MetLife's central risk compliance units.  SOF ¶ 45.  Plaintiff not only had never overhauled a compliance unit, but he had never even been in charge of a compliance unit or managed employees at MetLife.  SOF ¶¶ 60, 63.

Given Mr. Corbett's qualifications as compared to Plaintiff, as a "logical matter," no "reasonable employer would have found [Plaintiff] to be significantly better qualified for the job," than Mr. Corbett.  *Duckett*, 2015 WL 4911160, at *6 (emphasis added) (citations and quotations omitted).  As such, Plaintiff cannot raise an inference of discrimination that MetLife "*consciously* selected a less-qualified candidate," and he therefore cannot establish a *prima facie* case of discrimination.  *Id*.; *see also Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) (plaintiffs failed to establish *prima facie* case in failure to promote action where they offered no evidence that individuals who were promoted in their place were less qualified); *see also Wright v. City of Syracuse*, 2014 WL 1293527, at *26 (N.D.N.Y. Mar. 31, 2014) (granting summary judgment where plaintiff did not "show that the [position] was given to someone less qualified than him," and therefore failed to state a *prima facie* case), *aff'd*, 611 F. App'x 8 (2d Cir. 2015); *Sosa v. N.Y. Div. of Human Rights*, 2015 WL 5191205, at *8 (E.D.N.Y. Sept. 4, 2015) (plaintiff could not make out a *prima facie* case absent evidence that she was "more qualified than—or even as qualified as" the selected employee).

### 3.   MetLife Had Legitimate, Non-Discriminatory Reasons For Selecting Mr. Corbett for Chief Privacy Officer – He Was More Qualified.

Even assuming, *arguendo,* that Plaintiff could establish a *prima facie* case of discrimination (he cannot), his claim still fails because the undisputed evidence shows that he did not receive the Chief Privacy Officer position for a legitimate, non-discriminatory reason—he was not the most qualified for the job, which was going to include completely revamping the Privacy Office. *See Moy v. Perez*, 2016 WL 5239611, at *3-4 (S.D.N.Y. Sept. 21, 2016) (granting summary judgment on failure to promote claim where promoted employee had desirable prior job experience and better performance evaluations than plaintiff); *Duckett*, 2015 WL 4911160, at *7-8 (granting summary judgment where plaintiff was less qualified than the promoted employee).

In late 2014, MetLife was designated as a Significantly Important Financial Institution, which meant the Federal Reserve could come in at any moment and audit any of the compliance units within the CEC.  SOF ¶ 13.  As he prepared for this eventuality, Mr. Rayvid realized the Privacy Office in particular was not "up to snuff" because Mr. Trovato and his team (which included Plaintiff) were not adequately monitoring, testing, and conducting risk assessment activity.  SOF ¶ 19.  Plaintiff and others on the team were performing almost exclusively advisory functions – they were merely interpreting regulations, offering opinions, and providing advice in reaction to issues that arose.  SOF ¶ 23.  The Privacy Office should have been performing as a global oversight unit and actively dealing with local compliance teams, teaching the compliance teams how to perform risk assessments, and monitoring, testing, and tracking the progress of compliance teams in various countries.  SOF ¶ 22.  Mr. Rayvid and Mr. Luckey tried to get Mr. Trovato to run the Privacy Office this way (which is a way that would comply with the requirements of SR 08-8), but he simply could not get the Privacy Office (and those within the Privacy Office) to change course.  SOF ¶ 24.  Accordingly, Mr. Trovato was asked to move up

15

his retirement.  SOF ¶ 27.

Since everyone within the Privacy Office was "marching to Joe [Trovato's] drum beat, which was not the way [MetLife] wanted to go," Mr. Rayvid looked outside of the Privacy Office to find someone who could perform the task at hand.  SOF ¶ 32.  There, he quickly found Mr. Corbett, who had the exact experience needed to get a compliance unit "Fed Ready" and "up to snuff."  SOF ¶ 34.  He had completely overhauled the Anti-Corruption Unit and established the new model for MetLife's compliance programs.  SOF ¶ 35.  Plaintiff admitted he has no such experience.  SOF ¶ 61.  The only relevant experience Plaintiff had was experience in "privacy," but as Mr. Rayvid and Mr. Luckey both made clear, *they did not need someone with privacy experience*.  SOF ¶ 31.   Any privacy area could be learned or could be covered by other resources in the Privacy Office.  SOF ¶ 31.   They needed a person with experience transforming compliance units.  SOF ¶ 30.  Mr. Corbett was the most qualified for the particular task at hand as he had experience creating a gold standard global oversight unit that would pass muster with the Federal Reserve.  SOF ¶ 45.  Plaintiff had nothing of the sort.  SOF ¶ 59.

Moreover, the Privacy Office, under Mr. Trovato's leadership, was functioning in an advisory capacity.  Mr. Rayvid was trying to move the Privacy Office *away* from the way it was performing under Mr. Trovato and towards a monitoring and testing compliance oversight function, as required by SR 08-8. SOF ¶ 64.  If Mr. Rayvid "wasn't happy with the overall performance of the Privacy Office in complying with SR 08-8 and [Plaintiff] was a member of that department," it would simply have been illogical to give the Chief Privacy Officer position to Mr. Trovato's self-proclaimed "right hand man" who believed the Privacy Office should continue to function as it did under Mr. Trovato's leadership.  SOF ¶ 65.  In that regard, Ms. Williams, a White peer who had substantially more compliance experience than plaintiff (*see* pp. 7-8, *supra*), was also considered for the Chief Privacy Officer position at the same time as Plaintiff.  SOF ¶ 32.   Like him, she was rejected because, while she did at least have compliance

experience, she did not have experience in transforming a compliance unit.  SOF ¶ 32.

Accordingly, MetLife has clearly demonstrated a legitimate, non-discriminatory reason for

selecting Mr. Corbett as the Chief Privacy Officer.

      **4.**     **Plaintiff Has No Evidence That MetLife's Actions Were False Or Pretextual.**

Having proffered a legitimate, non-discriminatory basis for its actions, the burden shifts

to Plaintiff to "produce not simply some evidence, but sufficient evidence from which a

[factfinder] could reasonably conclude that discrimination was the real reason for the adverse

employment action, <u>and</u> the reasons proffered by the [defendant] were false."  *Moy*, 2016 WL

5239611, at *4; *see also Bell v. Metropolitan Transp. Authority*, 2013 WL 8112461, at *3

(S.D.N.Y. Nov. 1, 2013).  No such evidence exists here.

First, Plaintiff has no admissible evidence that MetLife's stated reasons for its actions

were false—nor could he, in light of his own admissions that he has no proof or information or

evidence to dispute the fact that Mr. Rayvid intended to revamp the CPO, or to question the

qualifications Mr. Rayvid and CEC management sought for the position.  SOF ¶ 85.  To the

contrary, Plaintiff admitted that he knew that MetLife wanted the Privacy Office to function

primarily as a compliance oversight function, and that Rayvid and Luckey thought Mr. Corbett

would be able to overhaul the Privacy Office because Corbett had overhauled Anti-corruption.

SOF ¶¶ 85-86.  Plaintiff's lack of any evidence of pretext contrasts with the undisputed

testimony from Mr. Rayvid, Mr. Luckey, and Mr. Corbett, who consistently testified that Corbett

had the unique experience and talent necessary to transition the CPO into a global oversight unit

that complied with the Federal Reserve's guidelines.  SOF ¶¶ 34-47.  The lack of any evidence of

pretext requires that Plaintiff's claims be dismissed.  *See Yu v. New York City Hous. Dev. Corp.*,

494 F. App'x 122, 125 (2d Cir. 2012) (affirming summary judgment on failure to promote claim

under Title VII, § 1981, the NYSHRL, and the NYCHRL where plaintiff had technical

qualifications but lacked the leadership and communication skills that the promoted candidate had); *Moy*, 2016 WL 5239611, at *6 (granting summary judgment on failure to promote claim where plaintiff was unable to show discriminatory pretext "aside from his own feeling that he was more deserving of the promotion."); *Wharff v. State Univ. of N.Y.*, 413 F. App'x 406, 408 (2d Cir. 2011) ("Where a decision...to promote…one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn."); *Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 320 (W.D.N.Y. 1999) ("[A]n employee's opinion about his own qualifications does not suffice to give rise to an issue of fact about whether he was discriminated against," particularly where promotion decision was not based on whether plaintiff was qualified, but whether he "was the best candidate for the job").

Second, while it is clear Plaintiff disagrees with MetLife's evaluation of his qualifications as compared to Mr. Corbett's qualifications, only MetLife's opinion of the candidates legally matters. *Oluyomi v. Napolitano*, 811 F. Supp. 2d 926, 943 (S.D.N.Y. 2011) ("An employer has the right to decide how it will value the qualifications of different candidates." (citing *Scaria v. Rubin*, 117 F.3d 652, 654-55 (2d Cir. 1997), *aff'd*, 481 F. App'x 693 (2d Cir. 2012)). Even if MetLife was wrong about their qualifications, such a mistake "does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for [discrimination]." *See Robinson*, 892 F. Supp. 2d at 430; *Duckett*, 2015 WL 4911160, at *8. Indeed, other than believing he was the most qualified candidate (apparently in the world), Plaintiff offers no other evidence to suggest that Defendants' stated reason for choosing Mr. Corbett (because he was actually the most qualified candidate based on his actual experience and past performance) is mere pretext in order to discriminate against Plaintiff. Accordingly, because Plaintiff has no admissible evidence of pretext to overcome MetLife's legitimate, non-discriminatory reasons, his failure to promote claims under Title VII, § 1981, and the NYSHRL fail as a matter of law.

18

C.     **Plaintiff's Failure To Promote Claim Also Fails As A Matter Of Law Under The NYCHRL.**

To state a claim of race discrimination under the NYCHRL, Plaintiff must show "by a preponderance of the evidence that []he has been treated less well than other employees" because of his race.  *See Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 258 (S.D.N.Y. 2009) (citation omitted).  Even under the NYCHRL's more liberal standard, to survive summary judgment after MetLife has articulated a legitimate, non-discriminatory reason for its conduct, Plaintiff must point to any evidence in the record that even one of MetLife's proffered reasons for selecting Mr. Corbett instead of Plaintiff is false.  *See Bennett v. Health Mgmt. Sys. Inc.*, 936 N.Y.S.2d 112, 124-25 (1st Dep't 2011) (granting summary judgment on NYCHRL race discrimination claim where "[p]laintiff put forward no evidence that defendant's explanations were pretextual, nor any evidence that a discriminatory motive co-existed with the legitimate reasons supported by defendant's evidence").  Plaintiff's failure to promote claim is equally deficient under the NYCHRL standard because, as explained above, he cannot point to any admissible evidence that MetLife's stated reasons were false or pretextual, and he cannot link MetLife's decision not to promote him to his race.  *See id.*; *Mullins v. Consolidated Edison Co. of New York, Inc.,* 2015 WL 4503648, at *10 (S.D.N.Y. July 22, 2015) (NYCHRL claims must be dismissed where there is no evidence that plaintiff was denied a position due to race); *Sealy*, 688 F. Supp. 2d at 258-59 (granting summary judgment on NYCHRL claim where plaintiff failed to present evidence giving rise to an inference of discrimination).

Since Plaintiff cannot establish that Defendants' decision was motivated in any way by discrimination, summary judgment is warranted.

III.    **PLAINTIFF'S RACE DISCRIMINATION CLAIMS AGAINST MR. RAYVID FOR FAILURE TO PROMOTE SHOULD BE DISMISSED.**

Plaintiff cannot maintain a claim of race discrimination against Mr. Rayvid pursuant to §1981, nor can he maintain a claim against him under the NYSHRL or NYCHRL under either a

"direct theory" or an "aiding and abetting" theory. *Pierre v. City of New York*, 2020 WL 353538, at *12 (S.D.N.Y. Jan. 21, 2020); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012). Any claim pursuant to §1981 or based on a "direct theory" of liability under the NYSHRL or NYCHRL fails because there is no evidence that Mr. Rayvid participated in any discriminatory conduct and Defendants have shown there were legitimate, non-discriminatory reasons for selecting Mr. Corbett. *See* Section II.B.3, *supra*. Indeed, the record evidence establishes that Mr. Rayvid selected Mr. Corbett for the position of Chief Privacy Officer after careful consideration of numerous candidates' qualifications as they related to the needs of the Privacy Office. SOF ¶¶ 32-34. Mr. Rayvid needed someone at the helm of the Privacy Office who had turned a compliance office into a global oversight unit before, and who had experience managing employees in a compliance office. SOF ¶ 34. Mr. Corbett had that exact experience – Plaintiff did not. SOF ¶¶ 35, 59. And, of course, Mr. Rayvid never made any racist or disparaging comments about or to Plaintiff, did not post racist or inappropriate cartoons or jokes, and did not engage in any other action that Plaintiff thought was discriminatory. SOF ¶ 91. Plaintiff had only positive interactions with Mr. Rayvid and admitted he in fact had no idea "whether or not [Mr. Rayvid] had any discriminatory animus or was racist in a way." SOF ¶¶ 92, 95.

Any "aiding and abetting" claim against Mr. Rayvid also fails as a matter of law because Plaintiff has failed to establish a viable race discrimination claim for failure to promote against MetLife. *Davis-Bell*, 851 F. Supp. 2d at 687 (granting summary judgment on plaintiff's NYSHRL, NYCHRL, and § 1981 failure to promote claims against individual defendants where plaintiff failed to establish employer's liability for discrimination); *Stinnett v. Delta Air Lines, Inc.*, 2019 WL 1493224, at *9 (E.D.N.Y. Mar. 31, 2019) (dismissing NYCHRL aiding and abetting claim because court already dismissed primary discrimination claims, which were prerequisites for successful aiding and abetting claim). Moreover, any aiding and abetting

claims must be dismissed because Mr. Rayvid cannot aid and abet his own conduct.  *Suarez v. Am. Stevedoring, Inc.*, 2009 WL 3762686, at *27 (E.D.N.Y. Nov. 10, 2009) (dismissing NYCHRL aiding and abetting claim because the employer-defendant could not aid and abet its own conduct); *White v. Pacifica Foundation*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (granting summary judgment on aiding and abetting claim against individual defendant under the NYSHRL and NYCHRL and collecting cases holding an individual cannot be held liable for aiding and abetting his own conduct); *see also Strauss v. N.Y. Dep't of Educ.*, 26 A.D.3d 67, 73 (3d Dep't 2005) ("[W]e hold that individuals cannot be held liable under Executive Law § 296(6) for aiding and abetting their own violations of the Human Rights Law.").  The only conduct of which Plaintiff complains is Mr. Rayvid's selection of Mr. Corbett, and not Plaintiff, for the Chief Privacy Officer position.  Mr. Rayvid obviously could not have aided or abetted himself in that decision.  *See Suarez*, 2009 WL 3762686, at *27; *White*, 973 F. Supp. 2d at 378; *Strauss*, 26 A.D.3d at 73.

Accordingly, summary judgment should be granted on all of Plaintiff's claims against Mr. Rayvid.

## IV. PLAINTIFF'S TITLE VII DISPARATE PAY CLAIM AGAINST METLIFE SHOULD BE DISMISSED.

Plaintiff's claim that MetLife discriminated against him based on his race and gender by paying his former coworker, Ms. Williams, an annual salary that was a mere $5,000 higher than his, fails as a matter of law.  To state a *prima facie* case of discriminatory disparate pay under Title VII, a plaintiff must show: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus.  *Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002).  Plaintiff cannot satisfy the second and third prongs of a *prima facie* case because he was not "similarly situated" to Ms. Williams and no evidence exists that MetLife

acted with discriminatory intent in determining Plaintiff's pay.

### 1. **Plaintiff and Ms. Williams Did Not Perform the Same Job**

In order to support his disparate pay claim, Plaintiff must establish that he was paid less than comparator employees who were "similarly situated in all material respects" (*i.e.*, there were "similarities in education, seniority, performance, and specific work duties"). *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal quotations and citations omitted). Plaintiff and Ms. Williams were clearly not "similarly situated in all material respects." Ms. Williams worked for MetLife for 7 years longer than Plaintiff. SOF ¶ 106. Ms. Williams was a Director for more than two years longer than Plaintiff. SOF ¶ 107. Ms. Williams has a masters' degree; Plaintiff does not. SOF ¶ 108. Ms. Williams is a Project Management Professional; Plaintiff could not pass the test to become a PMP. SOF ¶ 109. Ms. Williams worked "on the compliance side;" Plaintiff worked on the technical side. SOF ¶ 112. Ms. Williams was directly involved in creating the Compliance program for Privacy at MetLife, and Plaintiff admitted she had more experience in Compliance-related controls. *Id.* ¶ 114. In short, Plaintiff had to admit, and did, that Ms. Williams' job duties were different than his. *Id.* ¶ 120. Here are Plaintiff's own words:

"I'm working on different types of projects."

"So we were working on very different projects . . .."

"Those were not the types of projects that Christin . . . worked on."

"Nor was she actually doing that kind of work."

"Christin's work had nothing to do with the project work that I was doing."

"So we worked on very different types of projects."

"Q: So in that regard you were doing substantially different things, correct? A: Yes."

SOF ¶ 120.

Ms. Williams' years of experience at MetLife and seniority over Plaintiff more than

justify the modest $5,000 difference in annual salary.  *See Simpson v. Metro-North Commuter R.R.*, 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006) (employees with "comparable job responsibilities" but differences in seniority and performance history were not "similarly situated"); *DeJesus v. Starr Technical Risks Agency, Inc.*, 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004) (granting summary judgment on disparate pay claim where comparator employees had higher education than the plaintiff and performed different types of job duties); *McPherson v. NYP Holdings, Inc.*, 2005 WL 2129172, at *5 (E.D.N.Y. Sept. 1, 2005) (dismissing Title VII disparate pay claim where comparator employee in same job position nonetheless performed "additional, highly skilled tasks in this capacity" and had more experience and a higher salary history than plaintiff).

## 2. There Is No Evidence of Discriminatory Intent in Paying Ms. Williams Slightly More than Plaintiff

Plaintiff admits he has no evidence to show that Ms. Williams' salary was slightly higher than his because of any discriminatory intent.  SOF ¶ 97.  Plaintiff also concedes that paying someone a slightly higher salary based on years of service at MetLife is a "good faith" reason for a slight pay differential.  SOF ¶ 98.

Plaintiff also admits that he believes it was his direct supervisor, Mr. Trovato, who made the decisions on his and Ms. Williams' compensation.  SOF ¶ 125.  But he has not accused Mr. Trovato of discrimination, and he can point to nothing discriminatory that Mr. Trovato ever did or said.  SOF ¶ 126.  To the contrary, Mr. Trovato served as a mentor to Plaintiff and went to lunch with him every other week.  SOF ¶ 127.  Mr. Trovato knew that Plaintiff and Ms. Williams were doing different things, knew that Ms. Williams was more senior (by seven years), and knew that Ms. Williams had been a director longer.  SOF ¶ 129.  Mr. Trovato also knew that, in the only full year that Plaintiff worked, Plaintiff missed deadlines on projects, and coached Plaintiff that he needed to focus on his assigned projects to move them to completion when due and to

better understand the Company's business structure in order to be able to get things done.  SOF ¶ 130.  Given everything that Mr. Trovato knew, Plaintiff admitted that he has no evidence that the slight difference in pay was because Plaintiff was a man or to show any discriminatory intent or animus.  SOF ¶¶ 124, 132.

Accordingly, like his defective race discrimination claim, Plaintiff admitted that the *only* basis for his disparate pay claim is that "[Ms. Williams] is a white woman and [Plaintiff is] a black man," and there was a difference in their salaries.  SOF ¶ 131.  That is not enough to prevail on a disparate pay claim or to survive this motion.  Evidence of discriminatory animus must consist of admissible facts beyond the mere circumstance that Ms. Williams was paid more than Plaintiff and is a white woman.  *See Conigliaro v. Horace Mann School*, 2000 WL 45439, at *13 (S.D.N.Y. Jan. 19, 2000) (rejecting plaintiff's argument that discriminatory intent may be inferred from the fact that plaintiff and another woman were paid less than a comparable male employee); *see also Satterfield*, 2003 WL 22251314, at *14 ("[A]dversity in the workplace coupled with membership in a protected class does not, standing alone, give rise to an inference of discrimination."); *Coraggio v. Time Inc. Magazine Co.*, 1996 WL 139786, at *5 (S.D.N.Y. Mar. 28, 1996) ("[A] plaintiff [alleging Title VII discrimination] must do more than show that []he belonged to a protected group and that []he suffered adversity at the workplace.").  Accordingly, Plaintiff's disparate pay claim fails and should be dismissed.

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment in Defendants' favor and dismiss all of Plaintiff's remaining claims with prejudice.

Dated:   New York, New York
         September 28, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:  _/s/ Christopher A. Parlo_____
       Ashley Hale
       Christopher A. Parlo
       Melissa C. Rodriguez
       101 Park Avenue
       New York, New York 10178
       Tel.:  (212) 309-6000
       Fax:  (212) 309-6001
       Attorneys for Defendants