UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 08/10/2021

TONY SPIRES,

                              Plaintiff,

            v.

METLIFE GROUP, INC., AND
DOUGLAS RAYVID,

                              Defendants.

No. 18-CV-4464 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

Plaintiff Tony Spires brought this action against MetLife Group, Inc., Douglas Rayvid, Tom Luckey, and Ricardo Anzaldua (collectively, "Defendants"), asserting claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").[1] Spires, an African American man, charges principally that Defendants discriminated against him on the basis of his race when they did not select him as the company's chief privacy officer, choosing a white man by the name of Jonathan Corbett instead. Defendants have moved for summary judgment, arguing that the record evidence does not permit a reasonable inference that their selection of Corbett over Spires was the product of race discrimination and that they selected Corbett because of his superior qualifications and their desire to overhaul the company's privacy office. *See* Dkt. 74. For the following reasons, the motion is granted.

---

[1] In June and July 2020, the parties stipulated to the dismissal of all claims against Anzaldua and Luckey. *See* Dkts. 63, 68.

# BACKGROUND

## A.  Factual Background[2]

Plaintiff is an African American man who worked as a Lead Data Privacy Consultant in MetLife's Corporate Privacy Office (the "privacy office"), an office that implements and supports MetLife's privacy and information security global compliance programs, from October 2014 to his resignation in March 2016. Defendants' Local Rule 56.1 Stmt. ("Def. 56.1"), Dkt. 76, ¶¶ 7, 9. The privacy office is part of MetLife's Corporate and Ethics Compliance Department and helps ensure MetLife's business complies with relevant regulations and mitigates compliance risks. *Id*. ¶ 2. Plaintiff was the only African American man in the 120-person CEC department at his level of seniority. Pls. Rule Local 56.1 Stmt. ("Pl. 56.1"), Dkt. 87, ¶ 133; *see also* Affidavit of Tony Spires ("Spires Aff."), Dkt. 88-1 ¶¶ 3-6. For most of Plaintiff's time at MetLife, his boss was Joseph Trovato, who led the privacy office as the chief privacy officer. Def. 56.1 ¶ 10.

In 2014, the Financial Stability Oversight Counsel, a federal organization chaired by the Secretary of the Treasury, designated MetLife as a "Significantly Important Financial Institution," or "SIFI." *Id*. ¶ 11. This designation meant that MetLife was subject to the Federal Reserve's oversight, had to comply with expectations of the Federal Reserve, and could be subject to an audit of its compliance programs at any time. *Id*. ¶¶ 12-13. The Federal Reserve Division of Banking Supervision and Regulation's Supervisory Letter SR 08-8 ("SR 08-8") lays

---

[2] The following facts are drawn from the parties' Rule 56.1 Statements and their submissions in connection with Defendants' motion for summary judgment and, except where otherwise noted, are not in dispute. Where facts in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence and denied only by way of a conclusory statement by the other party, without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be undisputed. *See* S.D.N.Y. Local Rules 56.1(c)-(d).

out certain expectations and explains how SIFI compliance departments should have a framework for monitoring, reporting, and preparing for compliance risks. *Id*. ¶¶ 14-15. Upon MetLife's designation as a SIFI, all its compliance departments, including the privacy office, were required to adhere to the federal government's expectations set out in SR 08-8. *Id*. ¶ 17.

According to testimony proffered by Defendants, senior MetLife officials sought to overhaul the privacy office in response to the new federal requirements, in anticipation of "a full Fed audit of [MetLife's] Compliance Program." Luckey Dep. 114, Dkt. 77-1. Defendant Rayvid, MetLife's chief compliance officer, reviewed all the company's compliance programs and found that the privacy office, in particular, was "not up to snuff." Def. 56.1 ¶ 19; Luckey Dep. 20. Rayvid testified that he felt the privacy office under Trovato's leadership was insufficiently "proactive" with respect to "identifying, assessing, controlling, measuring, monitoring and reporting on Compliance Risks." Rayvid Dep., 18-19, Dkt. 77-2; *see also* Luckey Dep. 50 ("I had discussions with [Rayvid] about the fact that the Privacy function was not moving towards the kind of monitoring and testing discipline . . . as the other central risk units."). Laura Heeger, the company's chief compliance officer for Europe, the Middle East, and Africa, asserted that during Trovato's tenure at MetLife, the offices responsible for compliance were changing to become "more like auditing departments," but that the privacy office under Trovato "had not adopted this changed approach as the rest of compliance at MetLife had." Declaration of Laura Heeger ("Heeger Decl."), Dkt. 102, ¶ 3. Heeger was "very frustrated with Mr. Trovato's lack of responsiveness" and expressed her frustrations with his leadership of the privacy office to Rayvid. *Id*. ¶¶ 5-6. Rayvid and Tom Luckey, another senior compliance official, testified that they attempted to work with Trovato to change the course of the privacy office, but that it continued to operate in a manner contrary to their preferences. Def 56.1 ¶¶ 19-20. In particular,

they worried that the office was not "Fed Ready." *Id*. ¶¶ 23-26. Rayvid accordingly "asked"—or "forced"—Trovato to retire earlier than Trovato had intended, as Rayvid was "not satisfied with the performance of the Metlife Privacy organization, nor with Mr. Trovato's leadership of that organization." Def. 56.1 ¶ 27; Rayvid Dep. 35; Spires Dep. 253-254, Dkt. 77-3.

Plaintiff purports to dispute Defendants' evidence that Rayvid and other MetLife executives were dissatisfied with the direction of the privacy office or that the office was not keeping up with the federal government's expectations. Plaintiff laments that Defendants "have not produced any *documentary* evidence that Rayvid 'was not satisfied with the performance of the MetLife Privacy organization, nor with Mr. Trovato's leadership of that organization.'" Pl. 56.1 at 13 (emphasis added). Plaintiff also asserts that MetLife's compliance program was, in fact, "Fed Ready." *See* Spires Aff. ¶¶ 26-42. He points to Trovato's 2015 performance evaluation, which includes the word "Completed" alongside the goal "Ensure our Compliance Program is 'Fed-Ready.'" *See* Dkt. 88-10. In the Court's view, as explained in detail below, none of these responses suffice to create a genuine dispute of material fact as to what MetLife leadership believed to be necessary for the privacy office—the record evidence makes clear that they wanted a change of direction.

Upon Trovato's early retirement, Rayvid needed to hire a new chief privacy officer. Spires wanted the job, and, although the position was never formally posted and no interviews were held, he was considered for it. *See* Pl. 56.1 ¶¶ 137-144; Luckey Dep. 83-84. Plaintiff believed that he would be hired as the new chief privacy officer, stating in his affidavit that Trovato had initially hired Spires with an eye to his eventually helming the privacy office. Pl. Aff. ¶¶ 19-20; Spires Dep. 30-31. Linda Hain, Trovato's secretary, was also under the impression

that Trovato wanted Spires—his "right hand man"—to take over as chief privacy office when he retired. Affidavit of Linda Hain, Dkt. 88-6, ¶¶ 15, 20.

That is not, of course, what happened. Luckey and Rayvid considered "all the members of the [privacy office]" as potential replacements for Trovato, but their "consensus was that the unit was not going in the right direction," and that the current staff of the office were "marching to [Trovato's] drumbeat, which was not the way we wanted to go." Luckey Dep. 83; Def. 56.1 ¶¶ 30-33. Defendants proffer testimony that they wanted to hire someone who had experience leading the overhaul of a corporate department and who was an expert in managing compliance risk, not necessarily someone with privacy expertise. Def. 56.1 ¶¶ 30-31, 34; *See* Luckey Dep. 87 ("We decided we didn't really need a Privacy expert, so to speak, we needed a Compliance Risk Assessment expert."). It was hardly unusual for the head of the privacy office to lack substantive privacy experience: both Trovato and his predecessor as chief privacy officer, Juliane Kowalski, did not have substantive privacy experience before assuming the role. *See* Rayvid Decl. ¶ 6. Rayvid was particularly concerned about hiring someone who could get the office "Fed Ready." Luckey Dep. 72-73, 86-87.

Sometime in late 2015, Rayvid, Luckey, and Laura Heeger had a conversation in which Corbett—then the head of MetLife's Anti-Corruption Unit—was first mentioned as a possible replacement for Trovato. Luckey Dep. 71-74. *See also* Heeger Decl. ¶ 7 ("When Mr. Rayvid suggested that we replace Mr. Trovato with Jon Corbett, I was thrilled, and I knew he was the perfect person for the job."). As director of that unit, Corbett had led the overhaul of MetLife's global anti-corruption and anti-money-laundering compliance programs, helping turn the Anti-Corruption Unit into a "global oversight unit." Def. 56.1 ¶¶ 35, 39-40. Corbett had significant experience in compliance. *Id*. ¶¶ 40, 42-43; *see also* Corbett Dep., Dkt. 77-4, 48-50. He had also

uniformly received—unlike Spires—the highest performance ratings in the previous three years. Def. 56.1 ¶¶ 55-56, 69. Also unlike Spires, he had managed a compliance program and had directly overseen employees at MetLife. *Id.* ¶¶ 60-61. The record reflects that Plaintiff had not performed auditing work at MetLife, *id.* ¶ 67; that he testified that he was unaware of SR 8-08, *id.* ¶ 78; and that he had never run a compliance program, *id.* ¶ 87.

In March 2016, MetLife appointed Corbett to be chief privacy officer. Def. 56.1 ¶ 54. Rayvid testified that he chose Corbett over Spires for the following reasons: "Number one, that I wasn't happy with the overall performance of the Privacy Office in complying with SR 8-08 and [Spires] was a senior member of that department. Number two, [Spires] did not have the requisite experience needed to fill the role. And number three, [Spires] was not judged to be one of our most high potential employees." Rayvid Dep. 79.

Spires maintains that he was more qualified than Corbett to serve as chief privacy officer. *See* Spires Aff. ¶¶ 11-18. According to Plaintiff, Corbett "lack[ed] a privacy and information security background, which [is] key to increasing a privacy program's maturity level," *id.* ¶ 16, and the job "require[d] a privacy subject matter expert and a technologist who understands information security and emerging technical issues," *id.* ¶ 14. Spires also asserts that Corbett was not qualified to be chief privacy officer based on "MetLife's own job description" for the position. *See* Pl. Mem. at 3. The "job description" in question is contained in an email sent from Trovato to Rayvid in February 2016, after Trovato's retirement was already planned. *See* Dkt. 88-8. Plaintiff asserts that job description emphasizes privacy expertise, Pl. Mem. at 8, which Defendants dispute, *see* Rayvid Decl., Dkt. 98, ¶ 6. But either way, there is no evidence that the job description was ever actually used in the hiring process. According to a declaration submitted by Rayvid, this document was a draft job description that Trovato sent Rayvid, unsolicited and

after he had been asked to leave, and which Rayvid never used. *See* Rayvid Decl. ¶¶ 3-4. ("I do not recall ever asking [Trovato] to create a job description, and I doubt I would have done that given my view that he was not functioning at the level I wanted."). It is undisputed that MetLife never made a formal posting of this position, Pl. Mem. at 9, and there is no evidence in the record that the job description was used or that it reflects anything other than the views of Trovato—the outgoing jobholder—about what was required for the position. It is also undisputed that the previous two chief privacy officers came into the job without substantive privacy experience—they were, like Corbett, lawyers. *See* Rayvid Decl. ¶ 6.

Plaintiff resigned several weeks after Corbett began as chief privacy officer. In an email to Luckey on March 14, 2016, Spires lamented that a woman or person of color was not promoted to chief privacy officer, and more broadly expressed his frustration that MetLife leadership did not "fully understand diversity and what it means to actually provide equal opportunities to MetLife associates." Dkt. 88-9. Feeling that his "long term professional goals" would not be served by remaining at the company, he announced his resignation. *Id*.

### B.  Procedural History

Spires filed this action on May 20, 2018, asserting claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981; race, color, and age discrimination and retaliation pursuant to Title VII; age discrimination and retaliation pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* (the "ADEA"); unequal pay in violation of the Lilly Ledbetter Fair Pay Act of 2009 and Title VII; constructive discharge; intentional infliction of emotional distress ("IIED"); and race and age discrimination and retaliation pursuant to New York State Human Rights Law, Executive Law § 290, *et seq.* (the "NYSHRL") and the New York City Human Rights Law, § 8-107 (the "NYCHRL"). *See* Dkt. 1. On September 18,

2019, the Court granted Defendants' motion to dismiss with respect to all but Spires's failure-to-promote claims and his Title VII pay discrimination claim. *See Spires v. MetLife Grp., Inc.*, 2019 WL 4464393, at *3 (S.D.N.Y. Sept. 18, 2019). Following discovery, Plaintiff dismissed his claims against Anzaldua and Luckey. *See* Dkts. 63, 68. Defendants filed the instant motion for summary judgment on September 28, 2020. *See* Dkt. 74. While the motion was pending, the parties stipulated to the dismissal of Plaintiff's pay discrimination claim. Dkt. 92. The Court heard oral argument on the instant motion on July 22, 2021.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). To survive summary judgment, "a plaintiff must provide more than conclusory allegations . . . and show more than some metaphysical doubt as to the material facts." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106, 101 (2d Cir. 2010) (internal quotation marks and citation omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the

existence of a genuine dispute of material fact." *Id.* "However, when the burden of proof at trial

would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of

evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which

case "the nonmoving party must come forward with admissible evidence sufficient to raise a

genuine issue of fact for trial." *CILP Assocs., L.P. v. Price Waterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013).

## DISCUSSION

### I.    Title VII Failure to Promote Claim

Plaintiff first asserts a race discrimination claim for failure to promote under Title VII.

This claim is subject to the burden-shifting standard set forth by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Gorzynski*, 596 F.3d at 106.

Under the familiar framework, a plaintiff first bears the burden of establishing a *prima facie* case

of discrimination. If the plaintiff carries that burden, the burden shifts to the defendant, who must

then offer a "legitimate, non-discriminatory rationale for its actions." *Terry v. Ashcroft,* 336 F.3d

128, 138 (2d Cir. 2003). If the defendant satisfies that burden, he is entitled to summary

judgment unless the plaintiff can "come forward with evidence that the defendant's proffered,

non-discriminatory reason is mere pretext." *Weinstock*, 224 F.3d at 42. "The plaintiff must

produce not simply some evidence, but sufficient evidence from which a jury could reasonably

conclude that discrimination was the real reason" for the employer's action, and that "the reasons

proffered by the [defendant] were false." *Id*. (internal quotation marks omitted).

### A.  Plaintiff Cannot Establish a Prima Facie Discrimination Case

To establish a prima facie case of discrimination for failure to promote, a plaintiff must

demonstrate that (1) he is a member of a protected class; (2) he applied and was qualified for a

job for which the employer was seeking applicants; (3) he was denied the job; and (4) the

circumstances surrounding that action permit an inference of discrimination. *See Williams v.*

*R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004); *Howley v. Town of Stratford*, 217 F.3d

141, 150 (2d Cir. 2000). The parties do not dispute that Plaintiff is a member of a protected class

or that he sought and was denied the job.[3] Defendants argue, however, that no inference of

discrimination can be made on the existing record, in light of the fact that Plaintiff was not as

qualified for the position as Corbett. Def. Mem at 13-14. Plaintiff maintains that he was qualified

for the position—more qualified, he argues, than Corbett with respect to the responsibilities of

the chief privacy officer—and notes that Corbett was outside his protected class, giving rise to an

inference of discrimination. Pl. Mem. at 9-12.

At the outset, it bears noting that Plaintiff has not come forward with any direct evidence

of overt racial animus in the workplace. Indeed, it is undisputed that Spires was never subjected

to racially derogatory comments by anyone at MetLife. *See* Pl. Resp. to Def. 56.1 ¶ 91-92.

Instead, Plaintiff's argument that the circumstances of Corbett's hire permit an inference of

discrimination depends on his ability to make "[a] showing of disparate treatment—that is, a

showing that the employer treated plaintiff less favorably than a similarly situated employee

outside his protected group." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). In the

context of his failure-to-promote claim, whether Plaintiff can make a showing that he and

Corbett were "similarly situated" depends on whether he has come forward with "at least some

---

[3] Although Spires did not formally apply for the position, *see* Affidavit of Tony Spires ("Spires Aff"), Dkt. 88-1 ¶¶ 23-25, a plaintiff may establish a prima facie case of discrimination where, as here, "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004).

evidence that [their] qualifications were comparable." *Anyanwu v. City of New York*, No. 10 CIV. 8498 (AJN), 2013 WL 5193990, at *16 (S.D.N.Y. Sept. 16, 2013).

Although the task of establishing a *prima facie* case in a discrimination case has been described as a *"de minimis"* burden, *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001), and while it is under some circumstances sufficient for a plaintiff to show that "the position was filled by someone outside [his] protected class," *Diaz v. New York City Transit Auth.*, 98 F. App'x 58, 59 (2d Cir. 2004), in failure-to-promote cases courts generally compare the qualifications of the plaintiff and the more favorably treated employee at the *prima facie* stage. *See Fletcher v. ABM Bldg. Value*, No. 14-CV-4712 (NRB), 2018 WL 1801310, at *10-11 (S.D.N.Y. Mar. 28, 2018), *aff'd*, 775 F. App'x 8 (2d Cir. 2019) ("[T]o demonstrate an inference of discrimination for [a failure to promote] claim, plaintiff must establish that a fellow employee who did not share her race, ethnicity, color, sex, and/or gender—but who was otherwise similarly situated in all material respects—was promoted while plaintiff was not."); *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 410 (S.D.N.Y. 2006) (employee cannot establish *prima facie* case in a failure-to-promote case unless the plaintiff and the hired employee "share a sufficient amount of significant employment characteristics to be considered similarly situated," including "similarities in education, seniority, performance, and specific work duties."); *Duckett v. Foxx*, No. 12-CV-5203 (NGG), 2015 WL 4911160, at *6 (E.D.N.Y. Aug. 17, 2015), *aff'd*, 672 F. App'x 45 (2d Cir. 2016). As Judge Nathan explained in *Anyanwu*,

> [C]omparing qualifications at the *prima facie* stage makes intuitive sense, because selecting another employee for promotion instead of the plaintiff involves choosing among multiple candidates. The mere fact that the plaintiff was qualified for the job— which is established as the second element of the *prima facie* case—says nothing about which candidate was *more* qualified. As a logical matter, only if a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, can the factfinder legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless

11

> some other strong consideration, such as discrimination, enters into the picture. For that reason, an inference of discrimination cannot emerge until after a plaintiff's qualifications are compared against the promoted employee's.

*Anyanwu*, 2013 WL 5193990, at *15 (internal quotation marks and citations omitted). And crucially, even at the *prima facie* stage, the comparison of qualifications must be made with an eye to the "*defendant's* criteria for the position"—not to what plaintiff or the Court might find to be the most relevant qualifications. *Williams*, 368 F.3d at 127 (emphasis added).

The Court concludes that Plaintiff has failed to establish a *prima facie* case of race discrimination, because the undisputed record evidence establishes that Spires did not, to the same degree as Corbett, possess the qualifications that Defendants were seeking in a chief privacy officer.

To begin with, Corbett had some general qualifications that Spires lacked: uniformly positive performance evaluations, *see* Def. 56.1 ¶¶ 55-56, 69; a track record in managing employees at MetLife and overhauling an office, *see id.* ¶¶ 41-46; an additional two years of seniority at the company, *id.* ¶¶ 38; and a law degree, *id.* ¶ 37. These facts help rebut any inference of racial discrimination that could arise from MetLife's choice to promote Corbett over Spires. *See Bush*, 452 F. Supp. 2d at 410 (to be similarly situated, employees must have comparable "education, seniority, performance, and specific work duties").

But more importantly, even assuming that Spires and Corbett were similarly qualified with respect to their general level of education, seniority, and management experience, it is clear that Corbett better satisfied the particular criteria that Defendants stated they were seeking for this position. As discussed above, Defendants wanted to hire a chief privacy officer who could overhaul the privacy office, elevate the office's focus on mitigating compliance risks, and ensure that the office was operating consistently with the federal government's expectations. They felt

the office under Trovato was "not up to snuff" and insufficiently prepared to meet MetLife's new regulatory obligations following its SIFI designation. To meet these new needs, they were looking for someone with experience in transforming a unit of the company, managing a compliance department, and with the ability to take the department in a new direction. The record evidence demonstrates that Corbett possessed these qualifications, whereas Plaintiff was working as the "right hand man" of Trovato, whose approach to the office Defendants sought to replace.

Plaintiff argues that there is a genuine dispute of material fact regarding whether Defendants actually wanted to take the privacy office in a different direction, pointing to the lack of documentary corroboration of Rayvid and Luckey's testimony; the fact that Trovato's performance evaluation included the word "completed" next to the goal "Ensure our compliance program is Fed Ready;" and his own affidavit that argues that the privacy office was in fact operating in the manner that it needed to be. The Court disagrees.

First, Defendants are under no obligation to produce *documentary* evidence to corroborate Rayvid and Luckey's testimony regarding their views about the privacy office and Trovato's leadership. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, *including depositions* . . . ."); *Simmons v. City of New York*, No. 16-CV-1589 (VEC), 2017 WL 6397745, at *11, n.10  (S.D.N.Y. Dec. 13, 2017) ("A lack of documentary evidence bears only on the weight of Defendants' testimony. It does not create a genuine dispute of fact."). Second, to the extent that Spires has asserted, in an affidavit, that the privacy office was already functioning as it should have been under Trovato, *see* Spires Aff. ¶¶ 26-49, he is expressing a business disagreement with the MetLife executives who testified that they were trying to move

the office in a different direction, Def. 56.1 ¶ 64. Plaintiff's subjective disagreement with the direction of the office or his view that it was already functioning in an appropriate manner does not create a genuine dispute of material fact about whether Rayvid and others genuinely believed that the office needed to be overhauled, particularly in light of the strength of the evidence that they did hold those beliefs. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (in assessing employment discrimination claims, the Court does not "sit as a super-personnel department that reexamines an entity's business decisions"). Finally, the mere use of the word "Completed" on Trovato's performance review is insufficient, in the Court's view, to create a genuine dispute of material fact regarding whether Rayvid and others believed the privacy office was "not up to snuff," particularly in light of (1) the fact that Trovato received an "unsatisfactory" performance rating on the very same evaluation for failing to meet Rayvid's goal of keeping up with the SR 8-08 requirements, *see* Def. Reply. Mem., Dkt. 95, at 2 (citing Dkt. 88-10); and (2) Defendant's compelling and unrebutted explanation that the word "Completed" refers to the task of performing the assessment itself, not to a substantive statement that Trovato had completed his goals. *See* Dkt. 96 at 4-5 ; Rayvid Dep. 51 ("[T]hese are not ratings. This was a system requirement and . . . the word 'completed' did not have anything to do with the substance of the completion of the goal itself."); Pellechio Decl., Dkt. 100, ¶ 5. There is also evidence that the privacy office was, in fact, significantly changed under Corbett, which at the very least bolsters the credibility of Defendants' assertions that they wanted to change course. *See* Heeger Decl. ¶¶ 11-12 ("Quite simply, within just one year Mr. Corbett turned the Privacy Office into a top of the line global privacy compliance program."); Dkt. 77-8 at 33 (Rayvid's assessment was that Corbett "transformed Privacy from a US testing and advisory unit to a global oversight function"); Dkt. 88-12 (statement in Corbett's 2017 performance review

that "Jon has continued to transform our Privacy function to a global oversight function.").[4] For these reasons, there is no genuine dispute of material fact that Defendants wanted to move the privacy office in a different direction, and were unhappy with Trovato's performance.

Moreover, the fact that Spires was, in his view, more qualified than Corbett according to a draft job description that was never used is immaterial. It is undisputed that the job description, which emphasized substantive privacy experience, was drafted by Trovato and never used by the company. *See* Rayvid Decl. ¶¶ 3-4; Luckey Decl. ¶ 2. The existence of this draft document does not plausibly suggest that what Defendants were really looking for was someone with the sort of substantive privacy expertise that Plaintiff possessed. *See* Spires Aff. ¶¶ 7-18. That is especially so given that neither of the previous two chief privacy officers had substantive privacy experience when they started in that role. *See* Rayvid Decl. ¶ 6. Whether the job should have been filled by someone, like Spires, with substantive privacy expertise, or with someone, like Corbett, with experience overhauling a compliance department, is a subjective determination that Defendants were entitled to make. *See Williams*, 368 F.3d at 127; *Sarmiento v. Queens Coll. CUNY*, 386 F. Supp. 2d 93, 97–98 (E.D.N.Y.), *aff'd*, 153 F. App'x 21 (2d Cir. 2005) ("Defendant's decisions regarding the professional experience and characteristics sought in a candidate, as well as the search committee's evaluation of Plaintiff's qualifications, are entitled to deference."); *Oluyomi v. Napolitano*, 811 F. Supp. 2d 926, 943 (S.D.N.Y. 2011) ("An employer has the right to decide how it will value the qualifications of different candidates."). The

---

[4] In his affidavit, Spires purports to dispute the evidence that the privacy office actually changed course under Corbett, *see* Pl. Aff. ¶¶ 60-86, but as he left MetLife in 2016, the affidavit is not based on personal knowledge and is insufficient to create a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

difficulty for Plaintiff's argument is that, given the undisputed record evidence about what Defendants were seeking for the chief privacy officer role, he cannot show that he was comparably qualified to Corbett. He has therefore failed to establish a *prima facie* case for failure to promote. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) (plaintiffs failed to establish *prima facie* case on failure-to-promote claim in the absence of evidence that the promoted individuals were less qualified than the plaintiffs).

### B.  Defendant's Justifications and Plaintiff's Evidence of Discriminatory Intent

Assuming, *arguendo*, that Spires has established a *prima facie* case—that is, assuming he can show that Defendants' choice to hire Corbett could give rise to a reasonable inference of discriminatory intent—Defendants would still be entitled to summary judgment, because Defendants have "articulate[d] . . . legitimate, nondiscriminatory reason[s]" for hiring Corbett over Spires, *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (citation omitted), and Spires has not come forward with "sufficient evidence" from which a jury could reasonably conclude that "discrimination was the real reason" for Defendants' selection of Corbett. *Weinstock*, 224 F.3d at 42 (citation omitted).

Defendants have proffered the following reasons for their selection of Spires:

First, they were unhappy with the direction of the office under Trovato, particularly following MetLife's 2015 SIFI designation, which opened the company up to new scrutiny from the Federal Reserve. Def. 56.1 ¶ 13. Defendants accordingly asked Trovato to retire early. *Id*. ¶ 27. To replace Trovato, Defendants wanted to hire someone with significant compliance experience, not necessarily a privacy expert. *Id*. ¶¶ 30-31. They also wanted to look outside the privacy office to pick the next chief privacy officer, given their view that the existing staff was "marching to [Trovato's] drumbeat, which was not the way [they] wanted to go." Luckey Dep.

83; Def. 56.1 ¶¶ 30-33. Spires was not a compliance expert, *id*. ¶ 61, and was perceived to be Trovato's "right hand man." *Id*. ¶ 65.

Second, Defendants viewed Corbett as the most qualified person for the job. *See* Def. 56.1 ¶¶ 34-47. Defendants maintain that they picked Corbett because, given his managerial experience at the company, his experience overhauling MetLife's anti-corruption unit, his consistently excellent performance reviews, and their estimation of him as an emerging corporate leader, they felt he was uniquely suited for the job, and better suited than Plaintiff.

Plaintiff asserts that Defendants' proffered reasons are pretext for discrimination. He contends that MetLife was already "Fed Ready" under Trovato; that Defendants were not actually displeased with the direction of the officer under Trovato; and that Spires, more so than Corbett, possessed the necessary qualifications to be chief privacy officer. These arguments all fail.

First, as noted earlier, there is ample evidence that Rayvid and others were displeased with the direction of the privacy office under Trovato, that they were concerned MetLife was not "Fed Ready," and that they wanted to move the office in a different direction. *See supra* at 3; Def. 56.1 ¶ 19; Rayvid Dep. 18-19; Luckey Dep. 50; Heeger Decl. ¶¶ 2-7. Plaintiff attempts to dispute this evidence primarily by pointing to his own affidavit submitted in opposition to Defendants' summary judgment motion, which states, *inter alia*, that the privacy office was in fact "up to snuff" under Trovato. *See* Pl. Aff. ¶¶ 26–42. But as discussed above, Plaintiff's own beliefs that the office was operating in an appropriate manner—even if the finder of fact were to agree with him—do not meaningfully call into doubt the strength of Defendants' evidence that Rayvid and Luckey saw things differently. *See Jimoh v. Ernst & Young,* 908 F.Supp. 220, 226 (S.D.N.Y. 1995) ("As a matter of law, an employee's disagreement with an employer's business

decision is insufficient to prove discriminatory conduct."); *Sassaman v. Gamache,* 566 F.3d 307, 314 (2d Cir. 2009) ("[I]t is not the role of federal courts to review the correctness of employment decisions or the processes by which those decisions are made."). Plaintiff also points to a single word in Trovato's 2015 performance assessment—"Completed"—as evidence that the company viewed the privacy office as being "Fed Ready" under Trovato's leadership. This is simply not credible, given (1) Defendants' evidence that this word was a reference not to the substance of the goal but the technical completion of the assessment, Dkt. 96 at 4–5; (2) the fact that on the same performance evaluation, Trovato's work was deemed to be "unsatisfactory," Dkt. 88-10; and (3) that Trovato was indisputably asked to leave the company early, *see* Def. 56.1 ¶ 27. Because Plaintiff has not produced evidence from which a reasonable finder of fact could conclude that Defendants were content with the state of the privacy office under Trovato, he has not undermined the strength of their explanation for seeking a new direction in hiring Corbett.

Second, the record evidence shows that Corbett was more qualified than Spires, at the very least according to Defendants' subjective criteria about what the office needed. Plaintiff asserts that he was the most qualified candidate to lead the privacy office "based on MetLife's only job description for the [chief privacy officer]." Pl. 56.1 ¶ 31; Pl. Mem. at 3–4. But as previously noted, Defendants have shown that this "job description"—a draft sent by Trovato to Rayvid after the decision to hire Corbett had already been made—was never used or posted. *See* Rayvid Decl. ¶ 5 (The "Trovato Draft was not the official job description for the position of Chief Privacy Officer, and certainly not something I, or anyone else, considered when we were selecting the new Chief Privacy Officer"); Luckey Decl. ¶ 4 ("The draft job description was certainly not used to help select Mr. Trovato's replacement, and would not have been used as it did not describe what we wanted the CPO position to be in 2016 and beyond"). As discussed

above, in the Court's view, the record evidence shows that Corbett was better qualified than Spires based on both general criteria and the specific qualifications Rayvid and Luckey testified that they were looking for in a chief privacy officer, including managerial experience and compliance expertise. This is fatal to Spires' attempts to argue that the selection of Corbett was pretext for discrimination. As the Second Circuit recently reiterated, if the basis for a plaintiff's attempt to demonstrate pretextual discrimination is to argue that the plaintiff was more qualified than the chosen candidate, the plaintiff can defeat summary judgment only if the plaintiff's credentials are "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Peddy v. L'Oreal USA, Inc.*, 848 F. App'x 25, 26 (2d Cir. 2021) (quoting *Byrnie v. Town of Cromwell, B.d of Educ.,* 243 F.3d 93, 103 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e)). "[T]he court must respect the employer's unfettered discretion to choose among qualified candidates," *id*. (citation omitted), and must not "second-guess [the] employer's decision," *Yu v. New York City Hous. Dev. Corp.*, 494 F. App'x 122, 125 (2d Cir. 2012). *See also Wharff v. State Univ. of N.Y.*, 413 F. App'x 406, 408 (2d Cir. 2011) (quoting *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir. 1980)) ("Where a decision . . . to promote . . . one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn."). Because it can hardly be said that "no reasonable person . . . could have chosen [Corbett] over [Spires]," *Peddy*, 848 F. App'x at 26, Plaintiff cannot cast sufficient doubt on Defendants' proffered reasons for selecting Corbett.

## II.   Remaining Claims

Defendants should also be granted summary judgment on Plaintiff's failure to promote claim under the New York State Human Rights Law and the New York City Human Rights Law. The NYSHRL claim is governed by the same standards as the federal claim and fails for the same reasons. *See Fletcher*, 2018 WL 1801310, at *24 (citing <u>*Torres v. Pisano*</u>, 116 F.3d 625, 629 n.1 (2d Cir. 1997)). As to the NYCHRL, in light of the statute's "uniquely broad and remedial purposes," *Williams v. N.Y.C. Housing Auth.,* 872 N.Y.S.2d 27, 31 (2009), Plaintiff's city law claim requires an "independent analysis" from federal or state discrimination claims, *see Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 258 (S.D.N.Y. 2009). But Plaintiff's NYCHRL claim is still governed by "a similar framework," in which he must establish a *prima facie* case of discrimination and, if Defendants offer legitimate reasons for its actions, he must then show that "no reasonable jury could conclude either that the defendant[s'] reasons were pretextual or that the defendant[s'] stated reasons were not [their] sole basis for taking action, and that [their] conduct was based at least in part on discrimination." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75–76 (2d Cir. 2015) (internal quotation marks and citations omitted). Here, as discussed above, the record evidence does not permit a reasonable inference of discrimination, given that Corbett was better qualified than Spires to be chief privacy officer in light of what Defendants were seeking for the role, and given the absence of any evidence that racial discrimination played a part in MetLife's hiring process. Plaintiff has also failed to cast sufficient doubt on any of Defendants' proffered explanations for hiring Corbett such that a reasonable jury could conclude that racial discrimination played a part in their decision. For these reasons, Defendants are entitled to summary judgment on Plaintiff's NYSHRL and NYCHRL failure-to-promote claims as well.

Defendants are also entitled to summary judgment on Plaintiff's claims against Rayvid individually. To prevail on a claim pursuant to § 1981 or based on a "direct theory" of liability under the NYSHRL or NYCHRL, Plaintiff would need evidence to show that Rayvid personally participated in discriminatory conduct. *See Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687-688 (S.D.N.Y. 2012). As demonstrated above, the record evidence does not support a finding that Rayvid's choice to hire Corbett over Spires was discriminatory in nature. Moreover, Rayvid cannot be said to have aided and abetted any discrimination on MetLife's part where MetLife has not engaged in discrimination. *See id.* at 688 (where "Plaintiff has failed to establish any actionable employer discrimination," there is "no liability . . . that the individual defendants could have participated in or aided and abetted."). Summary judgment should therefore be granted with respect to Plaintiff's claims against Rayvid individually.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety. The Clerk of Court is respectfully directed to terminate Dkt. 74, to enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated:     August 10, 2021
           New York, New York

_____
     RONNIE ABRAMS
     United States District Judge